Filed 8/30/22  P. v. Sosa CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE, | D079361 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD279994) |
| LEO PAUL SOSA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Steven E. Stone, Judge.  Affirmed.

Nancy Olsen and Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

# I

# INTRODUCTION

Over the span of three weeks, a series of robberies took place at restaurants and convenience stores in San Diego County. Law enforcement officers believed the same person committed the offenses based, in part, on the fact that the perpetrator of each crime wore the same attire—a gray hooded jacket and a face covering. They dubbed the perpetrator the "windbreaker bandit."

Leo Paul Sosa was charged with the "windbreaker bandit" crimes. He was ultimately found guilty of eight counts of robbery (Pen. Code,[1] § 211; counts 1–7, 9) and one count of attempted robbery (§§ 664, subd. (a), 211; count 8). He admitted he was on felony probation when the crimes were committed (§ 1203, subd. (k)), and admitted he committed a serious felony prior (§§ 667, subd. (a)(1), 1192.7, subd. (c)) and a strike prior (§§ 667, subds. (b)–(i), 668, 1170.12). The trial court sentenced Sosa to an aggregate sentence of 24 years 4 months in prison.

Sosa challenges the sufficiency of the evidence supporting six of his robbery convictions (counts 1–6) arising out of three incidents. He contends substantial evidence did not support the jury's findings that he perpetrated the crimes. We reject these arguments and conclude ample evidence established Sosa's identity as the perpetrator of the crimes. The judgment is affirmed.

---

[1] Further undesignated statutory references are to the Penal Code.

## II

## BACKGROUND[2]

A. *Prosecution Case*

    1. *Robberies at Santana's in Lemon Grove (Counts 1–2)*

On November 27, at about 5:30 a.m., B.V. and J.V. were working at Santana's restaurant in Lemon Grove. B.V. testified a man entered the restaurant and banged a coffee cup on the counter, which caught her attention. She testified the man wore a gray zip-up jacket with his hood pulled up and something that looked like a gray, white, and brown scarf over his mouth. She testified the man was "big" and she believed he was Hispanic based on his manner of speech.

B.V. testified the man told her to open the register and give him the money. She said he had his hand in his jacket pocket and it looked like he was holding a gun. J.V. also believed the man was holding a gun because the man hit the counter with his hand and caused a metal sound. J.V. walked to the counter and the man, speaking in both English and Spanish, demanded that they hurry up with the money. B.V. testified the man turned and faced a customer, which allowed her to dial 911 and place the phone on the counter. She testified she took more than $200 in bills from the register and the man snatched them from her before walking out of the restaurant.

After the man left, B.V. spoke to the 911 operator who was on the phone line. Audio of the 911 call was played for the jury. During the call, B.V. stated the robber was a "big" Hispanic man. She estimated he weighed "200 something" pounds and stood about five feet six inches tall. She stated he wore a gray rain jacket and had a brown plaid scarf over his face.

---

2    All dates referred to herein occurred in 2018, unless otherwise noted.

Security footage showed the robber wearing a gray jacket with the hood up and a small black Velcro strip on the back of the hood. It also showed the robber wearing dark pants and black shoes. At trial, J.V. testified a gray windbreaker seized from the trunk of Sosa's car appeared to be the jacket worn by the robber. She also testified a pillowcase seized from Sosa's residence looked like the robber's face covering.

2. *Robbery at Shell Gas Station in La Mesa (Count 3)*

On November 29, at or about 5:45 a.m., R.C. was working at a convenience store at a Shell gas station in La Mesa. She testified a man entered the store holding a gun underneath a towel. She testified he wore a hat and a gray windbreaker-type jacket with the hood up. She testified he wore a light silky scarf over his mouth and black gloves on his hands. She could see the man's face from his nose to his forehead and believed he was Hispanic.

R.C. testified the man pointed his gun at her and told her, "Bitch, open the register." She emptied the register of its cash (approximately $70), handed over the money, and hit a hidden panic button. The man grabbed the money, left the store, and fled on foot.

After the robber left, R.C. called 911. Audio of the 911 call was played for the jury. During the call, R.C. described the robber as a heavyset Hispanic male. She said he wore a light gray windbreaker with the hood up and a scarf over his mouth. Security footage showed the robber wearing a gray jacket with the hood up, a dark hat, dark pants, and dark gloves. It also showed there was a small black Velcro patch on the back of the jacket hood.

At trial, R.C. identified Sosa as the Shell gas station robber. She was able to identify him because "his face [was] really chubby" and she "remember[ed] the wrinkles in the forehead and the nose." She testified

4

Sosa's weight and size were also consistent with the robber's heavyset weight and size. She further testified that a windbreaker recovered from the trunk of Sosa's car was the same jacket as the one worn by the robber.

R.C. testified the robber returned to the Shell gas station one morning after the robbery. She recognized him because of his face and his voice. A law enforcement officer took photographs of security footage showing the patron R.C. had identified as the robber. The officer testified he did not believe Sosa was the person on the security footage.

3. *Robberies at Santana's in Spring Valley (Count 4–6)*

On December 1, at about 7:00 p.m., M.G., C.O., and J.C. were working at Santana's restaurant in Spring Valley. M.G. and J.C. testified a man entered an employee-only back door to the restaurant. M.G. testified the man wore a fabric or cloth mask over his face, gloves on his hands, and a hoodie around his face. J.C. testified the man wore a "gray or white" puffy jacket, a scarf on his face, and black gloves. When J.C. was shown security footage from the November 27 and November 29 robberies, she testified the intruder at her restaurant wore clothing similar to the other robbers' clothing. C.O. testified the man wore a gray hoodie with the hood up.

M.G. believed the man had a gun because he brandished something underneath his sweater. J.C. believed he had a gun, too. According to M.G., the man told them, "You guys know what this is. This is a robbery. Give me the money. It's not a joke." M.G. testified he walked to the register, grabbed the cash drawer from the register, and handed the drawer to the man. He testified the man thanked him and left the restaurant through the back door.

5

After the man left, M.G. called 911. Audio of the 911 call was played for the jury. On the 911 call, M.G. said the robber wore a "mask and a hoodie over his head" and gloves on his hands.[3]

### 4. *Robbery at 7-Eleven in San Diego (Count 7)*

On December 5, shortly after 10:00 p.m., K.S. was working as a cashier at a 7-Eleven convenience store in San Diego. She testified she was checking in a product delivery when a man came into the store, banged on the counter, and demanded money. She testified he wore a gray windbreaker hoodie with the hood up, a covering over the lower portion of his face that she believed was a black and white scarf, and gloves on his hands. She testified he was a light-skinned black man or a Hispanic man. She estimated he weighed about 220 pounds and was about six feet tall.

K.S. believed the man had a weapon because he had his hand in his pocket and he appeared to point something at her. She testified she lied to the robber and told him one of the registers did not have cash inside it. She testified she then went to a second register, hid the larger bills, and took out the smaller bills. She testified the man threw and shattered a glass merchandise item because she was not moving quickly enough. She testified she then gave him between $100–200 in cash and told him to get out.

The man left the convenience store and K.S. called 911. Audio of the 911 call was played for the jury. During the 911 call, K.S. stated the robber was black. She stated he wore a gray hoodie windbreaker and a black and white scarf on his face. She stated she thought he wore gloves, too.

Security footage showed the robber wearing a gray jacket with the hood up, dark pants, and dark shoes. The jacket hood had a black tag like a Velcro

---

[3] M.G. later gave an account of the incident to law enforcement during which he stated that the robber wore a blue sweater.

patch. At trial, K.S. testified a gray windbreaker seized from the trunk of Sosa's car looked like the robber's jacket. Further, she testified a pillowcase seized from Sosa's residence was the same as the robber's face covering.

5. *Attempted Robbery at 7-Eleven in San Diego (Count 8)*

On December 15, at about 5:45 a.m., C.P. was working as a store clerk at a 7-Eleven convenience store in San Diego. He called 911 and reported that a man tried to rob the store. The 911 call was played for the jury. During the 911 call, C.P. reported that a man pulled out a pistol and told him to empty the register. He stated he walked out of the store without giving any money to the man, who left the store a few minutes later and fled on foot. He said the man wore a gray and black shirt and a black hat, with a covering over his face. He stated he believed the man was Hispanic, weighed "a good 215, 220, 225" pounds, and was about six feet three or four inches tall.[4]

A law enforcement officer testified about C.P.'s accounting of the incident. According to the officer, C.P. had described the perpetrator as a Hispanic male who spoke in a "distinctly Hispanic voice," weighed 215 to 220 pounds, and was about six feet four inches tall. He testified that C.P. told him the perpetrator wore a gray hoodie sweatshirt with the hoodie pulled up, a dark colored hat, a black bandana covering his face down to his chin, and blue or black pants. Security footage showed the criminal wearing a gray jacket, dark pants, and dark shoes.

6. *Robbery at 7-Eleven in La Mesa (Count 9)*

On December 15, at about 6:20 a.m., S.H. was working as a cashier at a 7-Eleven convenience store in La Mesa. He testified a man entered the store from a rear door, pointed a gun at him, and asked for money. He testified the

_____

4   C.P. invoked the Fifth Amendment and initially refused to testify at trial. He later agreed to testify, but stated he could not remember anything about the incident.

man wore a jacket with a hoodie up, a covering over his face, and gloves. He testified that, to the best of his recollection, the robber wore a beanie under his hoodie.

S.H. testified the robber took store merchandise including cigarettes, tobacco products, and lottery scratcher tickets. He testified he gave the robber $50–70 dollars from the cash register and the robber left the store through the back door.

After the incident, S.H. called 911. Audio of the 911 call was played for the jury. During the 911 call, S.H. stated the robber wore a white jacket, bright blue pants, and a covering over his face like a hankie. He also reported the robber wore a tan colored baseball cap.

Security footage showed the robber wearing a gray jacket with the hood up, a face covering, dark pants, and dark shoes. Once again, there was a small black Velcro patch on the back of the jacket hood.

The store owner reported the stolen lottery tickets to the California State Lottery. An investigator for the California State Lottery determined that a winning lottery ticket from the set of stolen tickets was cashed in and validated at a liquor store in National City about two and a half hours after the robbery. Relying on the liquor store's security footage, law enforcement officers identified Sosa as the person who cashed the stolen ticket. At trial, it was undisputed that Sosa cashed the stolen ticket.

7. *The Search of Sosa's Car and Residence*

On January 3, 2019, law enforcement arrested Sosa at his residence in National City. Sosa was 31 years old, stood about six feet one inch tall, and weighed about 230 pounds. He had tattoos near his right eye and on his upper chest, neck, and hands. After Sosa's arrest, there were no more "windbreaker bandit" robberies in San Diego.

8

Law enforcement searched Sosa's vehicle. Officers seized a balled-up gray windbreaker and a black and white bandana from the trunk. The windbreaker had a small black Velcro patch on the back of the hood. Officers also searched Sosa's residence and seized several items from his bedroom including a pair of blue pants, a pair of tan pants, and two pairs of black pants. They also seized black shoes, black boots, and a predominately gray and white plaid pillowcase.[5]

B. *Defense Case*

1. *DNA Evidence*

As noted, the person who committed the robberies at Santana's on November 27 banged a coffee cup on the counter. A defense expert performed DNA testing on the "mouth" portion of the cup. The testing revealed a DNA mixture of two people—a 100 percent contributor and a less than one percent contributor. The defense expert testified Sosa was more closely associated with the less than one percent contributor than the 100 percent contributor. She opined it was 4.1 times more likely there were two unknown contributors rather than Sosa and one unknown contributor.

2. *Alibi Evidence*

a. *Company Safety Manager*

In November and December 2018, Sosa worked for an industrial and commercial scaffolding company. He worked on a crew that traveled to client worksites to erect or dismantle scaffolding.

A safety manager for the scaffolding company testified that members of the erection and dismantling crew have the option of traveling to a worksite either on their own or, alternatively, by riding on trucks from the company's

---

[5]     Sosa was found not guilty of robbing a smoke shop in San Diego on December 17. Because he was acquitted, we do not recount the details of the crime.

central yard in El Cajon. He testified most crew members ride on the trucks, which leave the yard by 6:00 a.m. so the crew is ready to work by 7:00 a.m. He testified crew members who ride on the trucks usually arrive at the yard by about 5:30 or 5:45 a.m. The company requires crew members to sign a time ticket when they arrive at the worksite. However, it does not require them to sign a time ticket at the central yard.

The company time ticket for November 27 (the date of the Santana's robberies in Lemon Grove) showed Sosa worked in San Marcos starting at 7:00 a.m. The manager estimated the construction truck would have left the central yard at about 5:30 or 5:45 a.m. to arrive at the worksite on time. As discussed, the Santana's robbery took place at about 5:30 a.m.

The company time ticket for November 29 (the date of the Shell gas station robbery) showed Sosa worked at the Sycuan Casino in El Cajon starting at 7:00 a.m. The manager estimated the truck would have left the yard at 6:00 a.m. for the Sycuan Casino job. As noted, the Shell gas station robbery took place at or about 5:45 a.m.

The manager testified Sosa routinely showed up at the central yard and went to the worksites on trucks. However, he did not know how Sosa traveled to his worksites on November 27 or November 29. He testified the jobs on those days were likely "soft start" jobs, meaning the erection and dismantling crews may not have started their work promptly at 7:00 a.m. Instead, they may have started "five or ten minutes" before or after 7:00 a.m.

b. *M.O. (Sosa's Partner)*

M.O. has been romantically involved with Sosa since high school, has two children with him, and lived with him in November and December 2018.

M.O. testified she woke up with Sosa at about 3:30 or 4:00 a.m. on his workdays and he generally left the house at 4:30 or 5:00 a.m. to "meet at the

10

shop." She testified he "mainly rode in the work truck" to client worksites, but sometimes drove himself if he missed the truck.

On cross-examination, M.O. testified Sosa does not own a gray jacket. However, after being shown the gray jacket recovered from the trunk of Sosa's car, she testified she remembered it and it looked like it was his jacket. Thereafter, she testified she did not know whether it was his jacket.

The prosecutor played the audio from a recorded jail call between Sosa and M.O. On the call, Sosa stated: "I mean, like I said, I have no one to talk to, you know. It's a rough – it's a rough spot I'm in. You know what I mean? Like, I – I, you know, *I did do it* – you know what I mean – but at the same time, I've gotta go through the whole trial bullshit, which I've never been through." (Italics added.) Shortly after, he said: "Like I'm just saying like can you fucking, you know, friend to friend – you know what I mean – partner to partner, fucking parent to parent, like, can you fucking just, you know, talk to me through this shit? Like fucking, [M.O.], I've been utmost and patient. You know what I mean? 'Cause I – you know what I mean – *I got myself into this*, but, at the same time, I need you babe." (Italics added.)

On redirect, M.O. testified the jail call occurred at a time when she suspected Sosa of infidelity. She testified she believed his statement, "I did do it," referred to his infidelity and not the crimes for which he was charged.

3. *Sosa*

Sosa testified in his own defense. He testified he is of Mexican, Italian, and Native American heritage. He testified he is not fluent in Spanish, though he knows some words in Spanish. Sosa denied committing any of the charged crimes.

Sosa testified he usually left his home early in the morning and drove to his employer's yard to ride on a truck. He testified he generally arrived at

11

the yard around 5:45 or 6:30 a.m. However, he testified he "sometimes" drove himself to worksites. He testified his car had a cracked radiator and would overheat if he drove it long distances.

Sosa testified he was "positive" he rode in a company truck to the San Marcos worksite on November 27 because his car "wouldn't make it." He estimated the truck left the yard at 5:30 or 5:45 a.m. that day. He testified he "probably jumped in the truck" for the Sycuan Casino job on November 29. He estimated he would have arrived at the yard at 5:40 to 6:00 a.m. that day. He testified he "probably" was with M.O. and his children on the evening of December 1 (when the Santana's in Spring Valley was robbed) and he was "probably" at home on the evening of December 5 (when the 7-Eleven in San Diego was robbed).

Sosa admitted he cashed in the lottery ticket that was stolen on December 15. However, he testified he got the ticket from a homeless person outside a 7-Eleven. He testified he was drinking beer in the 7-Eleven parking lot when the person approached and asked him for methamphetamine. He testified he sold drugs to the person in exchange for $20 and two lottery scratcher tickets, one of which was the stolen ticket.

Sosa testified he personally bought the gray windbreaker that was seized from the trunk of his car. He testified he put it into a fishing bag in his trunk and never wore it. He testified the black and white bandana seized from the trunk was his work bandana, which he would wear for protection from the sun and dust.

When questioned about his recorded jail call, Sosa testified that his statement, "You know, I did do it," referred to the fact he cashed in a stolen lottery ticket and possessed drugs when he was arrested. He testified his statement, "I got myself into this," referred to the fact he did drugs and sold

12

drugs in exchange for the stolen ticket. He denied his statements had anything to do with the charged crimes.

C. *Rebuttal Case*

The prosecution called an investigating detective as a rebuttal witness. The detective testified he and a colleague gave Sosa a *Miranda* warning and interviewed him after his arrest. During the interview, Sosa stated he received the gray jacket seized from the trunk of his car as a Christmas present. He insisted M.O. could verify he received the jacket as a Christmas present. After the interview, the detective spoke with M.O. She denied ever having seen Sosa with a gray windbreaker jacket.

## III

## DISCUSSION

Sosa challenges the sufficiency of the evidence supporting the jury's findings that he perpetrated the robberies at Santana's on November 27 (counts 1–2), the Shell gas station on November 29 (count 3), and Santana's on December 1 (counts 4–6). Sosa's argument is without merit. Substantial evidence established Sosa's identity as the perpetrator of each of these crimes.

A. *Legal Standards*

In assessing the sufficiency of the evidence to support a conviction, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.] We consider ' "whether ... *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] '[A] reviewing court "presumes in support of the judgment the existence of every

fact the trier could reasonably deduce from the evidence." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.) Further, a reviewing court " 'must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

B. *Substantial Evidence Supported the Convictions for Counts 1–2*

Sosa contends substantial evidence did not support the jury's findings he committed the robberies of B.V. and J.V. at Santana's on November 27. Viewing the evidence in the light most favorable to the judgment, and drawing all reasonable inferences in its favor, we conclude there was sufficient evidence establishing Sosa's identity as the perpetrator of these crimes.

Perhaps most compelling, security footage of the robbery depicted the robber wearing a gray jacket with the hood pulled up and a distinctive black Velcro patch on the hood. Law enforcement recovered an identical jacket from the trunk of Sosa's vehicle. The robber's jacket was also identical to a jacket worn by the perpetrator of several other crimes for which Sosa was convicted, including the attempted robbery of the 7-Eleven on December 14 and the robbery of the 7-Eleven on December 15—two convictions Sosa does not challenge on appeal. For certain of these crimes, there was overwhelming evidence establishing Sosa's identity as the perpetrator.[6]

There was additional evidence linking Sosa to the November 27 robberies. One of the victims described the robber as a large Hispanic male

---

[6]    In particular, Sosa cashed in a stolen lottery ticket two and a half hours after it was taken from a 7-Eleven store on December 15.

who weighed "200 something" pounds. Sosa matches this description, as he is of Mexican heritage and weighed 230 pounds. Further, the victim testified the robber wore a gray, white, and brown covering over his face. Law enforcement seized a pillowcase matching this description from Sosa's bedroom. When the victim was shown the pillowcase at trial, she testified it "look[ed] a lot like what [the robber] was wearing" on his face.

Further, Sosa made inculpatory statements to M.O. during a recorded jail call. He told M.O., "Like, I – I, you know, I did do it – you know what I mean – but at the same time, I've gotta go through the whole trial bullshit, which I've never been through." Then, he stated, " 'Cause I – you know what I mean – I got myself into this, but, at the same time, I need you babe." A rational jury could interpret Sosa's statements that he "did do it" and he "got [himself] into this" as admissions of guilt. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1207 [rational jury could view statement, "The devil made me do it," as admission of guilt], abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) These statements—combined with the similarities between Sosa's clothing and the robber's clothing, the similar modus operandi between the Santana's robbery and the other "windbreaker bandit" crimes, and the similarities between Sosa's physical appearance and the robber's physical appearance—constitute substantial evidence supporting the jury's finding that Sosa committed the Santana's robberies.

In challenging the sufficiency of the evidence establishing his identity as the Santana's robber, Sosa highlights evidence that, in his view, tended to exonerate him. For example, he points out that the robber left a coffee cup at the scene of the crime. According to a defense expert, DNA testing performed on the "mouth" portion of the cup revealed a mixture of two people and it was 4.1 times more likely there were two unknown contributors rather than Sosa

15

and one unknown contributor. However, as the People note, there was no evidence the perpetrator ever drank from the coffee cup. Thus, the exonerating effect of the DNA testing was minimal.

Sosa contends he could not have committed the robberies because the robber spoke certain words in Spanish and, at trial, he testified he does not speak much Spanish. Further, he claims he could not have been the robber because he had an alibi. In particular, he testified he caught a ride on his employer's truck on November 27, and the truck likely left his employer's yard at 5:30 or 5:45 a.m.—at or shortly after the Santana's robberies. Sosa's arguments do not establish a lack of substantial evidence. "It is the task of the jury, not the reviewing court, to determine the credibility of witnesses." (*People v. Solomon* (2010) 49 Cal.4th 792, 818.) While fulfilling this task, the jury was entitled to believe, or disbelieve, Sosa's self-serving testimony that he was not the robber.

Further, even if the evidence at issue had some tendency to exonerate Sosa, as he claims, he essentially asks us to reweigh the evidence and resolve any inferences from the conflicting evidence in his favor. However, when assessing the sufficiency of the evidence supporting a criminal conviction, " '[a] reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) Instead, our role is to review the record and determine whether it contains substantial evidence, controverted or uncontroverted, from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid.*) For reasons already discussed, the record before us contains substantial evidence from which a rational jury could find Sosa guilty beyond a reasonable doubt.

C. *Substantial Evidence Supported the Conviction for Count 3*

Next, Sosa asserts the evidence was insufficient to support the jury's finding that he robbed victim R.C. at the Shell gas station on November 29. We reject this sufficiency of the evidence challenge as well.

Much of the same type of evidence establishing Sosa's identity as the Santana's robber established his identity as the Shell gas station robber. Security footage showed the robber wearing a gray windbreaker jacket with the hood pulled up and a distinctive black Velcro patch. This jacket was identical to the one later seized from Sosa's trunk, as well as the jacket worn during many other "windbreaker bandit" crimes. Like the victims of the Santana's robberies, the victim of the Shell robbery described the robber as a heavyset Hispanic male. As discussed, Sosa matches this description. Finally, as noted above, a jury could infer Sosa's jail call statements were admissions that he committed the offenses for which he was charged.

In addition to all of this inculpatory evidence, the Shell robbery victim affirmatively identified Sosa as the perpetrator of the crime at trial. She pointed out specific features of his face that supported her identification, specifically the shape of his face and the wrinkles on his forehead and nose. "The law is clear that the '[i]dentification of the defendant by a single eyewitness may be sufficient to prove the defendant's identity as the perpetrator of a crime." (*People v. Hester* (2020) 58 Cal.App.5th 630, 635 (*Hester*); *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 ["Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding."].)

On appeal, Sosa characterizes the victim's identification of him as unreliable and flawed. He emphasizes that the victim initially identified a seemingly-different gas station patron as the perpetrator. However,

" '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction." (*People v. Elliott* (2012) 53 Cal.4th 535, 585; see *Hester, supra*, 58 Cal.App.5th at p. 635 [" '[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' "].) Here, the victim's identification of Sosa was neither impossible nor inherently improbable.

Sosa also argues he "presented compelling evidence" that he rode in his employer's truck to a worksite on the morning of the Shell gas station robbery. As discussed above, the jury was free to disbelieve Sosa's uncorroborated testimony. In any event, even if the jury did credit his testimony on this issue, the robbery occurred at or about 5:45 a.m., and Sosa estimated that he arrived at his employer's nearby yard as late as 6:00 a.m. Thus, under Sosa's own timeline of events, it is plausible he could have robbed the Shell gas station and *still* gotten to his employer's yard in time to ride on the company truck.

In sum, the victim's positive identification of Sosa as the perpetrator of the robbery, the strong similarities between Sosa's clothing and the robber's clothing, the similarities between Sosa's physical appearance and the robber's physical appearance, and Sosa's recorded jail call statements constituted substantial evidence supporting the robbery conviction.

D. *Substantial Evidence Supported the Convictions for Counts 4–6*

Lastly, Sosa argues substantial evidence did not support his convictions for robbing victims M.G., C.O., and J.C. at the Santana's in Spring Valley on December 1. Once again, we reject Sosa's sufficiency of the evidence claim.

Although there was no security footage of the robbery, there was witness testimony from which the jury could find the robber wore the same gray jacket that was seized from Sosa's trunk and worn during the other "windbreaker bandit" crimes. C.O. testified the robber wore a gray hoodie with the hood up. J.C. testified he wore a "gray or white" puffy jacket, a scarf, and black gloves. She also stated his clothing was similar to the clothing worn by the perpetrator of the November 27 and November 29 robberies. Additionally, M.G. testified the robber wore a hoodie (he could not recall the color), a mask, and gloves. Crediting these descriptions of the robber's clothing, a jury could reasonably infer the Santana's robber wore the same clothing as the person who committed the other charged crimes. Given the overwhelming evidence Sosa committed the other crimes, a jury could infer from the perpetrator's clothing that Sosa committed these robberies too.

The timing and location of the December 1 robberies also support Sosa's convictions. The December 1 robberies at Santana's occurred just four days after another Santana's was targeted a few miles away in Lemon Grove. As we previously concluded, there was substantial evidence Sosa perpetrated the Santana's robberies in Lemon Grove. In fact, all of the "windbreaker bandit" crimes were clustered within a few miles of one another in the same part of the county. Further, virtually every restaurant and convenience store that was targeted in the "windbreaker bandit" crime spree was located along the route Sosa commuted between home and his employer's central yard in El Cajon. These circumstances, as well as the similarities in the perpetrator's

19

clothing and modus operandi, give rise to a reasonable inference that the person who committed the December 1 Santana's robberies perpetrated the other "windbreaker bandit" crimes as well—that person being Sosa.

Finally, as previously discussed, Sosa made incriminating statements during his jail call with M.O. A rational jury could find these statements were admissions of guilt to all of the charged crimes, including the robberies at Santana's on December 1. Together with the other evidence just discussed, these recorded statements constitute substantial evidence supporting the jury's finding that Sosa committed the December 1 robberies.

## IV

## DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


O'ROURKE, J.